ORDERED.

**Dated:  March 05, 2019**

Roberta A. Colton
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**
www.flmb.uscourts.gov

In re

OILEDKIN GONZALEZ,                    Case No. 8:12-bk-19213-RCT
                                       Chapter 7

          Debtor.

_____

## <u>MEMORANDUM OPINION ON REMAND</u>

Lash Wilcox & Grace PL (formerly known as Lash & Wilcox PL) ("LW&G") is a law firm with a niche practice specializing in the prosecution of consumer protection cases on behalf of chapter 7 trustees.  Christine Herendeen ("Ms. Herendeen") is one of six chapter 7 trustees in the Tampa Division of the Middle District of Florida who retain LW&G to handle consumer protection lawsuits in her chapter 7 cases.

CadleRock Joint Venture, LP ("CadleRock") was a creditor of Oiledkin Gonzalez.[1]  Mr. Gonzalez filed a chapter 7 bankruptcy in late 2012.[2]  He testified at his first meeting of creditors on February 8, 2013 (the "341 Meeting") that CadleRock called his cell phone several times

_____

[1] CadleRock was not Mr. Gonzalez's original lender.  The debt is based on a 2006 loan from Star Funding, LLC and was first assigned to GMAC Mortgage, LLC.  It was then purchased by and assigned to CadleRock in 2009 as part of a bulk purchase of distressed loans.  Doc. 220, Ex. H (Shaulis Dep. 18–20, 41–42).
[2] Doc. 1.

demanding repayment after he told them to stop calling because he could not repay the debt.[3] Ms. Herendeen referred the matter to LW&G.

LW&G, in turn, filed a lawsuit against CadleRock.[4]  Count I of the complaint alleged multiple violations of the Florida Consumer Collection Practices Act ("FCCPA"), Fla. Stat. § 559.55 *et seq.*  Count II alleged multiple violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq.*[5]

On December 10, 2013, CadleRock sent LW&G a letter stating that the complaint was meritless,[6] and enclosed a proposed Motion for Sanctions pursuant to Fed. R. Bankr. P. 9011(c).[7] On December 17, 2013, LW&G dismissed the complaint against CadleRock, with prejudice, within the Fed. R. Bankr. P. 9011(c)(1)(A) 21-day safe harbor.[8]  The adversary proceeding was closed on December 27, 2013.

CadleRock then began what has become a five-year quest to punish LW&G and Ms. Herendeen for filing that lawsuit.  Because LW&G complied with Fed. R. Bankr. P. 9011 ("Rule 9011")[9] by dismissing the action within the safe harbor period, CadleRock could not pursue sanctions under Rule 9011.  So, CadleRock got creative.  First, CadleRock tried to sue LW&G

---

[3] Doc. 35, Ex. B, p. 5.

[4] Adv. No. 8:13-ap-01004-KRM (hereinafter "AP").

[5] AP Doc. 1.

[6] Doc. 35, Ex. E.

[7] A party that intends to file a sanctions motion under Fed. R. Bankr. P. 9011(c) must comply with the safe harbor provision of Fed. R. Bankr. P. 9011(c)(1)(A), which requires that the party seeking sanctions first serve the motion upon the offending party and give the offending party twenty-one (21) days to withdraw or correct the challenged pleading.  "This process provides a 'safe harbor' in which the offending party can avoid sanctions by withdrawing or correcting the challenged document or position after receiving notice of the alleged violation." *Gwynn v. Walker (In re Walker)*, 532 F.3d 1304, 1308 (11th Cir. 2008).

[8] AP Doc. 10.

[9] Rule 9011's counterpart in an action in the federal district courts is Federal Rule of Civil Procedure 11, often referred to, including herein, as "Rule 11."

and Ms. Herendeen for racketeering.[10]  When that failed,[11] CadleRock settled on a Motion for

Sanctions based on this court's inherent authority and 28 U.S.C. § 1927 (the "Motion for

Sanctions").[12]

## I.    PROCEDURAL BACKGROUND

CadleRock filed its Motion for Sanctions in August 2015.[13]  In June 2016, LW&G and

Ms. Herendeen filed an Amended Motion for Summary Judgment.[14]  The Honorable K. Rodney

May, then the presiding judge,[15] granted summary judgment in favor of LW&G and Ms.

Herendeen and denied CadleRock's Motion for Sanctions.[16]

CadleRock appealed to the District Court.[17]  During the appeal process, the District Court

requested statistics regarding the number of Consumer Protection Cases[18] filed and dismissed

by LW&G during the period January 1, 2011 through December 31, 2014 (the "Designated

Period").[19]  The parties complied and filed summaries and unsworn statistical information in the

District Court.[20]  Based on these statistics, the District Court reversed and remanded the Motion

for Sanctions for further consideration by this court in light of the statistical information.[21]

---

[10] *See* Docs. 32, 34, and 35.

[11] *See* Doc. 51 ("Order On Motion of CadleRock Joint Venture, L.P. to Reopen Bankruptcy Case and Motion for Leave to Sue Trustee and Special Counsel").  CadleRock appealed this Order along with two others (Docs. 48 and 49) to the U.S. District Court for the Middle District of Florida (the "District Court").  The District Court consolidated the three appeals under Case No. 8:14-cv-3212-JSM ("DC1") and subsequently affirmed all three Orders.  DC1 Docs. 22 and 84.

[12] Doc. 95.

[13] *Id*.

[14] Doc. 220.

[15] In July 2015, CadleRock unsuccessfully attempted to recuse Judge May.  Docs. 86 and 98.

[16] Doc. 232.

[17] CadleRock also appealed three additional orders.  The District Court consolidated the four appeals under Case. No. 8:16-cv-02046-JSM ("DC2").

[18] As used herein, the phrase "Consumer Protection Cases" refers to cases filed under the Florida Consumer Collection Practices Act ("FCCPA"), Fla. Stat. § 559.55 *et seq.*, the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq.*, and similar state and federal statutes.

[19] DC2 Docs. 26, 28, and 33.

[20] DC2 Docs. 25, 27, 31, and 34.

[21] DC2 Doc. 37; Doc. 297.

Judge May retired in December 2017.

To prepare the record for reconsideration of the Motion for Sanctions, this court entered two case management orders.  The first directed the parties to package the statistics in proper form for consideration on summary judgment.[22]  The second addressed discovery and related matters and set a schedule for oral argument.[23]

LW&G filed a declaration verifying the unsworn information previously provided to the District Court.[24]  CadleRock filed its own affidavits in response.[25]

## II.    SUPPLEMENTAL FINDINGS

As instructed, this court acknowledges the previous findings made by Judge May, considers the statistics, takes judicial notice of the court's own records and experience with cases of this type, and makes the following supplemental findings:

1.    Number of Cases.  Many Consumer Protection Cases have been filed in individual chapter 7 bankruptcy cases in the Tampa Division of this court. LW&G is not the only firm bringing these cases but is the most active.  The actual number of cases LW&G filed during the Designated Period is unclear.  LW&G calculates 2,865 complaints, although this number includes unfiled complaints resolved pre-suit.[26]  CadleRock, on the other hand, calculates 3,324 adversary proceedings filed during the Designated Period.[27]

Suffice it to say, the actual number of cases brought by LW&G on behalf of trustees during the Designated Period lies somewhere between 2,865 and 3,324.  Of these, based on the

---

[22] Doc. 334.
[23] Doc. 350.
[24] Doc. 336.
[25] Docs. 338 and 352.
[26] Doc. 336 ¶ 5.
[27] Doc. 352 ¶ 22.  CadleRock frequently counts a single adversary proceeding multiple times if there are multiple defendants.  This occurs so often that the court has little confidence in CadleRock's number.

court's own PACER research, only 135 adversary proceedings filed during the Designated Period are attributable to Ms. Herendeen.

2.    <u>Dismissals</u>.    Most Consumer Protection Cases are dismissed with prejudice, either by settlement or by stipulation of the parties.  Both LW&G and CadleRock include a column in their respective spreadsheets that purports to show the ultimate disposition of the cases cited.  LW&G labels its column "Reason Closed" whereas CadleRock labels its column "Status of Case."  There the similarities end.  Each uses various terms, none of which are defined, to explain the "Reason Closed" or "Status of Case."

According to LW&G, of the 2,865 complaints it counted during the Designated Period: (a) 2,016 were settled with a distribution to the estate; (b) 810 were dismissed (*i.e.* "agreed to drop") with no distribution to the estate; (c) 22 resulted in court abstention; (d) 9 resulted in a court decision, some of which resulted in distributions to the estate; (e) 7 resulted in a default; and (f) 1 was sent to arbitration.[28]

For its part, CadleRock states that for each adversary proceeding, it reviewed the docket to determine the case status and any recovery.  CadleRock uses the following terms to describe the disposition of a case:  dismissed with prejudice, dismissed without prejudice, dismissed, abstained, terminated, and left blank (indicating no adversary).[29]  But, CadleRock does not summarize the data in its "Status of Case" column in any meaningful way.

Accordingly, it is difficult for the court to objectively draw conclusions from either party's case disposition statistics.  However, according to the court's own tally of the 135 cases filed by Ms. Herendeen within the Designated Period, nearly two-thirds were settled with a distribution to the estate.

---

[28] Doc. 336-1 ¶ 5.
[29] Doc. 352 ¶ 17; Docs. 352-1 and 352-2.

3.    Trials.  Consumer Protection Cases generally do not go to trial.  Some result in the entry of a default judgment, dismissal, or are sent to arbitration.  Most cases have at least one pretrial conference, go through initial discovery, and settle after the exchange of information.[30]  Many are set for trial.[31]  One of Ms. Herendeen's cases apparently went to trial.[32] But, for the most part, these cases settle or are dismissed by agreement of the parties.

4.    Settlements.  Consumer Protection Cases generally settle for statutory damages, plus costs and attorneys' fees.[33]  Typically, the total settlement amount is under $5,000. Although there are exceptions, the net recovery to the estate is typically between $1,300 and $2,000 per case, after attorneys' fees are paid to LW&G.  This is true for most of the cases settled by Ms. Herendeen, though in one case she netted $23,100 for the estate.[34]  Every settlement is noticed to creditors and approved by the bankruptcy court overseeing the case.[35]

5.    Investigations.  For every Consumer Protection Case arising from a bankruptcy, the debtor has testified, under oath, at a creditor's meeting as required by 11 U.S.C. § 341.  The debtor's testimony is digitally recorded, and a transcript of the recording can be requested for a fee.[36]  LW&G relies upon this sworn testimony to file its Consumer Protection Cases.[37]

6.    Chapter 7 Trustees.  At least seven members of the chapter 7 trustee panel in the Tampa Division of this court (Ms. Herendeen, V. John Brook, Larry Hyman, Dawn Carapella, Stephen Meininger, Angela Welch, and Beth Ann Scharrer) referred Consumer Protection Cases to LW&G during the Designated Period.  Ms. Herendeen (the target here) was a relatively new

---

[30] See Fed. R. Civ. P. 26(a)(1) (made applicable to adversary proceedings by Fed. R. Bankr. P. 7026).
[31] This court currently has a bi-monthly trial docket for Consumer Protection Cases.
[32] Doc. 220, Ex. E (Herendeen Dep. 14:17–25).
[33] See infra Section III.A and B for a discussion of the statutory recoveries available under federal and state consumer protection statutes.
[34] See In re Richardson, Case No. 8:13-bk-14606-CPM (Doc. 33).
[35] Fed. R. Bankr. P. 9019.
[36] See, e.g., Doc. 35, Ex. B.
[37] Doc. 220, Ex. F (Lash Dep. 110:1–16).

trustee and, as indicated above, had far fewer cases with LW&G than any of the other chapter 7 trustees during the Designated Period.

7.     <u>Oversight and Guidance for Trustees</u>.  The Office of the United States Trustee selects and supervises the chapter 7 panel trustees.  Section 704 of the Bankruptcy Code sets forth the duties of a chapter 7 trustee which include the duty to "investigate the financial affairs of the debtor" and to "collect and reduce to money the property of the estate."[38]  The chapter 7 trustees also use a handbook for guidance.[39]  For an asset case, the handbook provides that there should be a "meaningful distribution" to creditors.[40]  The handbook does not define the phrase "meaningful distribution."  However, for purposes of guidance, the minimum recovery of an avoidable preference in a consumer case under the Bankruptcy Code is $600.[41]  Statutory damages under the Fair Debt Collection Practices Act are limited to $1,000 per action.[42]  Statutory damages under the TCPA are $500 per violation.[43]

8.     <u>Chapter 7 Distributions</u>.  The claims, recoveries, and distributions in consumer chapter 7 cases are generally small.  Indeed, most chapter 7 cases result in no recovery for creditors.  Sometimes, if the assets or the lawsuits do not pan out as expected, professionals are left holding the bag.  On occasion, there is a partial distribution to administrative (*e.g.*, trustee and professionals) and priority claimants (*e.g.*, domestic relations debts and tax claims), leaving little or nothing to general unsecured creditors.

9.     <u>Judicial Oversight of Attorneys' Fees and Costs</u>.  The bankruptcy court approves

---

[38] 11 U.S.C. § 704(a)(1), (4).
[39] *See* U.S. Dept. of Justice, Exec. Office for U.S. Trustees, Handbook for Chapter 7 Trustees (2012), https://www.justice.gov/ust/file/handbook_for_chapter_7_trustees.pdf/download.
[40] *Id.* at p. 4-1 (citing 28 U.S.C. § 586).
[41] 11 U.S.C. § 547(c)(8).
[42] 15 U.S.C. § 1692k(a)(1)–(3).
[43] 47 U.S.C. § 227(b)(3).

the applications of LW&G to represent a chapter 7 trustee as special counsel in every case in which LW&G is paid.[44] Every subsequent application for attorneys' fees filed by LW&G—and the other law firms that handle Consumer Protection Cases—are noticed to creditors in the chapter 7 case and approved by the bankruptcy court.[45] No fees are paid without court approval. This is true whether the Consumer Protection Case is filed in bankruptcy court, state court, or goes to arbitration. Generally, LW&G is employed on a modified contingency fee plus costs basis.[46] The estate recovers 100% of statutory damages awarded and 70% of actual damages awarded.[47] LW&G receives the attorneys' fees paid by the defendant as part of a recovery or settlement, plus 30% of the actual damages recovered by the estate.[48] No recovery, no fees.[49] For settled cases, LW&G typically takes a small discount and receives less than $2,000.

      10.   <u>Chapter 7 Trustee's Fees</u>. Under § 330 of the Bankruptcy Code, a chapter 7 trustee is entitled to "reasonable compensation."[50] Compensation is limited by the sliding scale percentages set forth in § 326 of the Bankruptcy Code. Chapter 7 trustees typically receive no compensation until the end of a chapter 7 case. Fees are calculated based on all recoveries by the trustee—not just Consumer Protection Cases—and are disclosed in a final report filed with the court. Creditors, the United States Trustee, or the bankruptcy court may object to a chapter 7 trustee's compensation and request a hearing on the matter.[51] Typically, the commissions set forth in § 326(a) are allowed, but the court has the discretion to reduce fees when appropriate.[52] In "no asset" cases, which most chapter 7 cases are, the chapter 7 trustee receives only a statutory

---

[44] *See* Fed. R. Bankr. P. 2014.
[45] *See* Fed. R. Bankr. P. 2016.
[46] Doc. 20 ¶ 6.
[47] *Id.*
[48] *Id.*
[49] *Id.*
[50] 11 U.S.C. § 330(a)(1)(A).
[51] 11 U.S.C. § 330(a)(2).
[52] *Id.*

fee of $60.[53]  If the debtor is indigent, which is not uncommon in chapter 7, the chapter 7 trustee is paid nothing.

## III.    **APPLICABLE LAW**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[54] In this context, "[a] genuine factual dispute exists only if a reasonable fact-finder 'could find by a preponderance of the evidence that the [non-movant] is entitled to a verdict [in its favor].'"[55] "Although all justifiable inferences are to be drawn in favor of the [non-movant], inferences based upon speculation are not reasonable."[56]

CadleRock's Motion for Sanctions must also be considered in light of the statutory framework constructed by consumer protection laws and the limitations imposed on this court in sanctioning parties where, as here, there has been no Rule 9011 violation.

### A.    **Federal Consumer Protection Laws**

Congress found that "[c]ollection abuse takes many forms, including obscene or profane language, threats of violence, telephone calls at unreasonable hours, misrepresentation of a consumer's legal rights, disclosing a consumer's personal affairs to friends, neighbors, or an employer, obtaining information about a consumer through false pretense, impersonating public officials and attorneys, and simulating legal process."[57]  Congress also found that "[a]busive

---

[53] 11 U.S.C. § 330(b).
[54] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see generally* Fed. R. Civ. P. 56(a) (made applicable by Fed. R. Bankr. P. 7056, 9014).
[55] *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1300 (11th Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).
[56] *Id*. at 1301 (internal quotations omitted).
[57] S. Rep. No. 95-382, at 2 (1977).

debt collection practices contribute to the number of personal bankruptcies, to marital instability, to the loss of jobs, and to invasions of individual privacy."[58] Because existing laws and procedures for remedying these wrongs were deemed inadequate to protect consumers,[59] the Fair Debt Collection Practices Act and the Telephone Consumer Protection Act were enacted.

### 1. Fair Debt Collection Practices Act

The Fair Debt Collection Practices Act ("FDCPA")[60] is the federal law regulating interactions between consumer debtors and "debt collector[s]," defined to include "any person who regularly collects . . . debts owed or due or asserted to be owed or due another."[61] In effect since March 1978, the law is designed to end serious and widespread abuse by third-party debt collectors.[62] Specifically, Congress enacted the FDCPA to: (1) protect consumers by eliminating abusive collection practices, (2) insure that debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and (3) promote consistent state action to protect consumers against debt collection abuses.[63] Among other things, the FDCPA prohibits debt collectors from making false representations as to a debt's character, amount, or legal status,[64] communicating with consumers at an "unusual time or place" likely to be inconvenient to the consumer,[65] or using obscene or profane language or violence or the threat thereof.[66]

The FDCPA was crafted to be self-enforcing, primarily leaving consumer victims to enforce compliance. The FDCPA provides that "any debt collector who fails to comply with

---

[58] 15 U.S.C. § 1692(a).
[59] 15 U.S.C. § 1692(b).
[60] 15 U.S.C. § 1692 *et seq.*
[61] 15 U.S.C. § 1692a(6).
[62] S. Rep. 95-382 at *1-2 (1977).
[63] 15 U.S.C. § 1692(e).
[64] 15 U.S.C. § 1692e(2)(A).
[65] 15 U.S.C. § 1692c(a)(1).
[66] 15 U.S.C. § 1692d(1), (2).

any provision of th[e] [Act] with respect to any person is liable to such person . . ."[67]  In addition to actual damages, plus costs and "a reasonable attorney's fee," a court may also award "additional damages," subject to a statutory cap of $1,000 for individual actions or, for class actions, "the lesser of $500,000 or 1[%] of the net worth of the debt collector."[68]

## 2.    Telephone Consumer Protection Act

The Telephone Consumer Protection Act ("TCPA")[69] was enacted in 1991 "to protect the privacy interests of residential telephone subscribers by placing restrictions on unsolicited, automated telephone calls to the home and . . . certain uses of facsimile ([f]ax) machines and automatic dialers."[70]  The legislation was a response to complaints stemming from the increased use of automated equipment by telemarketers.[71]  Because telemarketers called numbers randomly and sequentially, having an unlisted phone number did not stop the calls.[72]  Such calls were a nuisance and an invasion of privacy.[73]  When the TCPA was enacted, approximately 40 states had passed legislation to regulate unsolicited calls.[74]  However, state legislation proved ineffective to combat unwanted interstate calls.[75]  Telemarketers avoided state laws by locating their phone centers out of state.[76]  The TCPA lists a number of prohibited debt collection practices designed to protect the privacy of consumers.[77]

Significantly, the TCPA also provides for a private right of action and statutory damages. Unlike the FDCPA, the TCPA does not include an express provision for costs and attorneys'

---

[67] 15 U.S.C. § 1692k(a).
[68] 15 U.S.C. § 1692k(a)(1)-(3).
[69] 47 U.S.C. § 227 *et seq.*
[70] S. Rep. 102-178 at *1 (1991).
[71] *Id.*
[72] *Id.* at *2.
[73] *Id.*
[74] *Id.* at *3.
[75] *Id.*
[76] H.R. Rep. 102-317 at 9 (1991).
[77] 47 U.S.C. § 227(b)(1).

fees if a consumer obtains a judgment against a defendant.  But, the TCPA does provide for treble damages when there is a finding that the defendant's conduct was willful or knowing.[78]

## B.    State Consumer Protections Laws

Florida's consumer protection laws are consistent with federal law.[79]  Like Congress, the Florida legislature deemed it important "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce" and declared such acts to be unlawful.[80]

### 1.    Florida Consumer Collections Practices Act

Collection agencies operating in Florida are subject to the Florida Consumer Collection Practices Act ("FCCPA").[81]  The FCCPA, Florida's counterpart to the FDCPA, similarly lists prohibited debt collection practices to increase the level of protection available to consumers.[82] These laws are intended to work in tandem with the FDCPA.  Fla. Stat. § 559.552 states that "[n]othing in [the FCCPA] shall be construed to limit or restrict the continued applicability of the federal [FDCPA] to consumer collection practices in this state."  Furthermore, "[i]n the event of an inconsistency between [the FCCPA] and any provision of [the FDCPA], the provision which is more protective of the consumer or debtor shall prevail."[83]

The FCCPA grants consumers a private right of action to sue for violations of the law and to recover actual damages sustained, statutory damages, and punitive damages.[84]  The

---

[78] 47 U.S.C. § 227(b)(3).
[79] Fla. Stat. § 501.202(3).
[80] Fla. Stat. § 501.202(2).
[81] Fla. Stat. § 559.55 *et seq.*
[82] *See* Fla. Stat. § 559.72.
[83] Fla. Stat. § 559.552.
[84] *See* Fla. Stat. § 559.72.

FCCPA also expressly authorizes the recovery of attorneys' fees and costs to a successful plaintiff as a means to encourage consumers to bring these suits.[85]  "A clear public policy underlies the fee-shifting provisions of the FCCPA:  to 'ensure that lawyers will represent individuals with valid claims, despite a limited amount of potential damages.'"[86]

### 2. <u>Florida Deceptive and Unfair Trade Practices Act</u>

The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") is another consumer protection law which prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."[87]  The statute also provides that a violation of "[a]ny law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices" is a violation of FDUTPA.[88]  In enacting FDUTPA, the Florida legislature explicitly provided that the Act must be "construed liberally [t]o. . . simplify, clarify, and modernize the law governing consumer protection . . . and [t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition . . . and [t]o make state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection."[89]

To further those policies, FDUTPA authorizes both government enforcement and a private right of action.[90]  For private enforcement actions, FDUTPA provides that "[i]n any action brought by a person who has suffered a loss as a result of a violation of this part, such

---

[85] *See Brook v. JP Morgan Chase Bank, N.A. (In re Burdett)*, No. 8:09-bk-00816-KRM, Adv. No. 8:09-ap-00390-KRM, 2015 WL 150848, at *2 (Bankr. M.D. Fla. Jan. 12, 2015).
[86] *Id*. at *2 n.12 (quoting *In re Jones*, 494 B.R. 569, 574 (Bankr. M.D. Fla. 2013)).
[87] Fla. Stat. §§ 501.201–501.213.
[88] Fla. Stat. § 501.203(3)(c).
[89] Fla. Stat. § 501.202.
[90] Fla. Stat. §§ 501.207 & 501.211(2).

person may recover actual damages, plus attorney's fees and court costs."[91]

### C.     <u>Bases for Imposing Sanctions</u>

#### 1.     <u>Inherent Authority</u>

A federal court has an inherent authority to sanction parties appearing before it.[92]  This authority extends to bankruptcy courts, primarily through 11 U.S.C. § 105.[93]  But, because inherent powers are so broad, courts are admonished to exercise caution when invoking them to sanction litigants.[94]

To impose sanctions under its inherent authority, a court must find that the challenged conduct "constituted or was tantamount to bad faith."[95]  A finding of bad faith is appropriate when "an attorney knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent."[96]  Delaying or disrupting the litigation or disrupting enforcement of a court order also supports a finding of bad faith.[97]

Because of the constraint of bad faith, inherent power "is both broader and narrower than other means of imposing sanctions."[98]  The court's "inherent power extends to a full range of litigation abuses" and can be invoked even if other rules sanction the same conduct, "for these rules are not substitutes for the inherent power."[99]  The threshold of bad faith conduct required under the court's inherent power "is at least as high as the threshold of bad faith conduct for

---

[91] Fla. Stat. § 501.211(2).
[92] *Chambers v. NASCO*, 501 U.S. 32 (1991).
[93] *In re Haque*, 395 B.R. 799, 803 (Bankr. S.D. Fla. 2008) ("The Court's power to sanction resides both in 11 U.S.C. § 105(a) and in the inherent power of the federal courts to sanction improper conduct." (citations omitted)).
[94] *Chambers*, 501 U.S. at 50.
[95] *Durrett v. Jenkins Brickyard, Inc.*, 678 F.2d 911, 918 (11th Cir. 1982); *see also Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998) ("The key to unlocking a court's inherent power is a finding of bad faith.").
[96] *Barnes*, 158 F.3d at 1214.
[97] *Id.*
[98] *Chambers*, 501 U.S. at 46.
[99] *Peer*, 606 F.3d at 1314 (quotation and citation omitted).

sanctions under [28 U.S.C.] § 1927."[100]

Usually, if a court cannot impose sanctions under Rule 11, the court should not exercise its inherent powers to sanction.[101]    Otherwise, the safe harbor of Rule 11 would be meaningless.[102]  "But if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power" to sanction bad faith litigation conduct.[103]  Section 105(a) of the Bankruptcy Code specifically authorizes the power "to prevent an abuse of process."[104]    Nevertheless, like all inherent powers, it "must be exercised with restraint and discretion."[105]

## 2.    28 U.S.C. § 1927

Sanctions under 28 U.S.C. § 1927 are intended to discourage the unreasonable and vexatious multiplication of proceedings.[106]  A court may impose sanctions under § 1927 if three requirements are satisfied:  (i) an attorney has engaged in unreasonable and vexatious conduct; (ii) the unreasonable and vexatious conduct must have multiplied the proceedings; and (iii) the financial value of the sanction must bear a nexus to the excessive proceedings.[107]  An attorney is deemed to have multiplied the proceedings unreasonably and vexatiously "only when the attorney's conduct is so egregious that it is 'tantamount to bad faith.'"[108]  Bad faith is an objective standard that is satisfied by a showing that an attorney knowingly or recklessly pursues

---

[100] *Id.* at 1316 (citation omitted).

[101] *In re Engle Cases*, 283 F. Supp. 3d 1174, 1241 (M.D. Fla. 2017).

[102] *See Lincoln-Gaston Farmers Mut. Ins. Co. v. General Elec. Co.*, No. 5:08cv50, 2009 WL 1677245, at *3 (W.D. N.C. June 15, 2009) ("This principle finds support in the purpose of Rule 11's twenty-one safe harbor period, namely to allow the offending party twenty-one days to withdraw the offending claims and escape sanctions." (quoting *Giganti v. Gen-X Strategies, Inc.*, 222 F.R.D. 299, 308–09 (E.D. Va. 2004)); *see also* Fed. R. Civ. P. 11 advisory committee's note to 1993 amendment (noting the safe harbor is intended so that timely withdrawal of a challenged pleading or paper will serve to protect a party from a motion for sanctions).

[103] *Chambers*, 501 U.S. at 50.

[104] 11 U.S.C. § 105(a).

[105] *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764 (1980).

[106] *Peer*, 606 F.3d at 1314.

[107] *Peterson v. BMI Refractories*, 124 F.3d 1386, 1396 (11th Cir. 1997).

[108] *Peer*, 606 F.3d at 1314 (quoting *Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1239 (11th Cir. 2007)).

a frivolous claim.[109]  Finally, § 1927 "'require[s] clear and convincing evidence that sanctions are justified.'"[110]

As a court established under Article 1 of the United States Constitution, it is not clear that a bankruptcy court can issue sanctions under § 1927.[111]  If not, sanctions imposed by a bankruptcy court should be treated as a recommendation to the district court.[112]

## IV.   CONCLUSIONS

### A.   So, What Do The "Statistics" Show or Not Show?

"There are three kinds of lies: lies, damned lies and statistics."[113]  This quote is sometimes attributed to Mark Twain—who some say attributed the statement to Benjamin Disraeli—who may not have been the first to say it after all.  No matter the source, the quote has colored statistical analysis for some time.  But the quote is only partially true.  Certainly, statistics can be fabricated or manipulated, but they can also be a useful tool if the underlying data is accurate and neutral in selection and interpretation, and adequate controls are made for outside variables.  An understanding of the difference between causation and correlation is also necessary to put statistics into proper perspective.[114]

Here, the statistics presented by both sides should be viewed with skepticism.  Neither party has opted to use an independent expert to gather or interpret the case data at issue.  Lacking anything impartial, the court conducted its own review of court documents on PACER and

---

[109] *Id.*

[110] *In re Engle Cases*, 283 F. Supp. 3d at 1225 (quoting *Lawyers Title Ins. Corp. v. Doubletree Partners, L.P.*, 739 F.3d 848, 872 (5th Cir. 2014)).

[111] *See generally In re Evergreen Sec., Ltd.*, 381 B.R. 407, 411–12 (Bankr. M.D. Fla. 2007) (citing 28 U.S.C. § 157(c)(1); *IRS v. Brickell Inv. Corp. (In re Brickell Inv. Corp.)*, 922 F.2d 696, 701 (11th Cir. 1991)).

[112] *See generally Wellness Int'l Network, Ltd. v. Sharif*, 135 S.Ct. 1932 (2015).

[113] Mark Twain, *Chapters from My Autobiography: XX*, 185 The North American Review 618, 465–74 (1907).

[114] "Correlation (or association) of two variables is just a matter of their moving together.  Correlation does not prove causation[.] . . . Just because two things move together, doesn't mean the one is pushing the other; the sun doesn't rise every day because the rooster crowed."  M. Elizabeth Karns, *Statistical Misperceptions*, 47-JUN Fed. Law. 19 *20 (2000).

randomly spot checked much of the data that has been presented by the parties.

CadleRock's statistics are clouded by misapplications of bankruptcy and consumer protection laws which skew its numbers.  For example, in cases where the trustee had recoveries in addition to those derived from Consumer Protection Cases, CadleRock attributes the entire trustee fee to the Consumer Protection Cases.  This is just wrong and significantly overstates the trustee fees attributable to Consumer Protection Cases.  An example of this is found in the Affidavit of Michelle Harris and her examination of Case No. 8:09-bk-26264-KRM.[115]  Ms. Harris states that $2,370.57 was paid to the trustee from the settlement of the Consumer Protection Case.[116]  The settlement amount paid to the estate was $3,350.00.[117]  However, a review of the trustee's Final Account and Distribution shows that the trustee's fee was actually based on a percentage of gross receipts of $22,305.72.[118]  Consequently, Ms. Harris' follow up claim that only $729.43 went to general unsecured creditors is wrong.  What makes this error even more baffling is the fact that Ms. Harris states in her affidavit that "[t]he trustee's final report and accounting were reviewed to see how the settlement/recovered funds were disbursed . . . [t]his information was placed in the Spreadsheet."[119]

The analysis presented by LW&G is also not without flaws.  Although LW&G properly states the applicable law, some of its calculations are off and the data selection is not always neutral, *i.e.* the data does not give the complete picture.  Specifically, the aggregate recoveries touted by LW&G do not tell the whole story.

---

[115] Doc. 338 ¶ 17.
[116] *Id*.  The Consumer Protection Case in question began as adversary proceeding 8:11-ap-00263-KRM.  The bankruptcy court granted the defendant's motion to abstain, and the trustee then filed the case in state court.  *See In re Squiciarino*, 8:09-bk-26264-KRM (Doc. 49).
[117] *In re Squiciarino*, 8:09-bk-26264-KRM (Doc. 49).
[118] *In re Squiciarino*, 8:09-bk-26264-KRM (Doc. 63 pp. 3-4).
[119] Doc. 338 ¶ 12.

Ultimately, the court finds that the statistics add little to the issues presented in CadleRock's Motion for Sanctions. Instead, what emerges from the morass of data is a wealth of obviousness but no disputed issues of material fact.

First, it should surprise no one that lots of Consumer Protection Cases arise from individual chapter 7 cases. This is the natural by-product of the creditor harassment that often drives consumers to seek personal bankruptcy in the first place. Indeed, as discussed above, Congress made this express finding when it enacted the FDCPA.

Second, Consumer Protection Cases rarely go to trial. Again, undisputed and no surprise. Small dollars are usually at issue and a reasoned cost benefit analysis should drive all litigation decisions. As discussed above, the FCCPA expressly authorizes the recovery of attorneys' fees and costs to a successful plaintiff (but not a defendant) to encourage consumers to bring these suits.[120] Instead of unnecessarily prolonging cases and milking them for fees, LW&G and the trustees arguably minimize fees by settling cases well before trial and discounting fees in settlements.[121]

Third, in most cases, the award of attorneys' fees exceeds the estate's recovery. Again, undisputed and no surprise. Surely this is the expected result when a statutory private right of action authorizes attorneys' fees for nominal statutory awards. Non-reciprocal, fee-shifting provisions in consumer protection statutes are designed to encourage counsel to take on small consumer cases. The statutes not only protect consumers from predatory debt collectors, but they also protect law abiding debt collectors from commercial disadvantage.

---

[120] *Brook*, 2015 WL 150848, at *2.

[121] CadleRock's arguments also suggest that debt collectors are willing to pay small settlements to avoid litigation without regard to the merits of the case. To the extent that debt collectors are making calculated business decisions, it is not something with which this court can or should be concerned. But that is plainly at odds with what happened here. And it flies in the face of CadleRock's statistical argument that far too many cases are dismissed with no recovery to the estate.

Finally, many Consumer Protection Cases are dismissed with prejudice by agreement of the parties very early in the litigation.  This process of weeding out the good claims from the bad claims is anticipated by the operation of Federal Rule of Bankruptcy Procedure 7026 (early disclosure and exchange of information) and Rule 9011 (*e.g.* the debtor was mistaken or less than truthful or the claim was sold or sent to a third-party debt collector).  The court might be more concerned if cases dragged along on the docket in the face of bad evidence.

In short, the court finds nothing seriously disputed or remarkable from the statistics themselves.  So, we turn to the specific claims for sanctions in view of these statistics and consider some of the more difficult questions.

### B.    The Claim for Sanctions Against the Chapter 7 Trustee

Should a chapter 7 trustee send a case to a contingency fee lawyer if the expected statutory recovery is less than $2,000?  There could be some disagreement here.  But from the trustee's perspective, when she makes a referral, she has determined only that a potential claim exists based upon the debtor's sworn testimony.  She does not know what discovery might uncover.  And, as with any contingent case, there is no risk if there is no recovery.

From the creditors' perspective, why not?  Aggregating small distributions in consumer bankruptcies can add up to a reasonable distribution to creditors.[122]  The alternative is that the debtor gets a discharge, the case is closed, the good creditors get nothing, and the bad debt collector is free to move on to the next consumer victim without consequence.

Should the bankruptcy system fear having multiple contingency fee lawyers attend a first meeting of creditors at the trustee's behest?  This potential practice obviously troubled the

---

[122] For example, one of the cases the court spot checked is *In re Rudisill*, Case No. 8:12-bk-10518-CPM.  There, Ms. Herendeen was the chapter 7 trustee.  She retained LW&G to pursue three Consumer Protection Cases.  All three were settled, netting approximately $5,500 to the estate.  The Trustee's fee, based on gross receipts, was $1,300.  The dividend to unsecured creditors was 31.3%.  *See id.*, Doc. 47 ("Trustee's Final Report").

District Court who viewed these hypothetical lawyers as "birds of prey."[123]  This court is not similarly troubled.  If there is a potential personal injury claim, the trustee would be wise to invite a personal injury lawyer to assess the claim and the debtor as a potential witness because that claim now belongs to the creditors and the bankruptcy estate.  If the debtor has a patent that has been infringed, the trustee would be smart to invite a patent lawyer to assess the claim that now belongs to the creditors and the bankruptcy estate.  If the debtor may have fraudulently transferred money to a relative, the trustee would be smart to invite a lawyer specializing in avoidance actions to evaluate the claim and the debtor.  And, if a chapter 7 trustee can persuade these lawyers to attend the meeting of creditors to evaluate her potential claims for free, or to take those cases on a contingency fee basis, she is doing a service to the bankruptcy estate and its creditors.  Indeed, because most chapter 7 cases are no-asset cases, these potential contingent claims may be the only hope creditors have of any recovery.

Consumer Protection Cases are different from other potential claims only because the statutory damages are small, and they are often overlooked.  There are no specific questions on the official bankruptcy schedules and forms to identify a consumer protection claim.  There is a general question that asks the debtor to identify any potential claims, but many debtors, especially *pro se* debtors, cannot be expected to know their rights under consumer protection laws or many other laws for that matter.  The trustee, therefore, should not be faulted for asking probing questions at the meeting of creditors.  To uncover potential personal injury actions, the trustee asks about car accidents or falls.  To ferret out any potential consumer protection claims, the trustee must ask the debtor if they have been called or otherwise harassed by creditors in the lead-up to bankruptcy.  In this regard, a consumer protection claim really is no different than

---

[123] Doc. 297.

any other undisclosed asset which may have been intentionally or (more likely) unintentionally omitted from the debtor's schedules.

Here, Ms. Herendeen's examination of the Debtor at the 341 Meeting was thorough and complete.  She uncovered the nature of the CadleRock debt, that CadleRock had called the debtor four times every two or three weeks, that the calls were made to Debtor's cell phone, and the identity of his cell phone provider.  At the end of the 341 Meeting, she asked permission to have her attorneys (LW&G) contact the debtor to investigate any potential claim.  No one else asked any questions at 341 Meeting.[124]

The trustee was doing her job and the statistics demonstrate only that she referred relatively few cases to LW&G during the Designated Period and received modest compensation for her efforts.  The attempt to sanction Ms. Herendeen, or remove her as a panel trustee, is without merit or cause.  Nothing in the record suggests that she was in cahoots with LW&G (or any of the other law firms handling such cases) or received anything beyond her Congressionally authorized statutory fees, as reviewed and approved by the United States Trustee and the bankruptcy court.

Accordingly, summary judgment will, again, be entered in favor of Ms. Herendeen.

### C.    The Claim for Sanctions Against LW&G

LW&G made clever a business decision—that it is more likely than not that a consumer debtor who seeks bankruptcy relief may have been pushed into that choice by oppressive debt collection tactics.  This business decision is unquestionably sound.  The issue is whether the tactics and procedures employed by LW&G are abusive to the bankruptcy system and rise to the level of sanctionable bad faith abuse of process.  Those tactics are now reviewed in the context

---

[124] Doc. 35, Ex. B.

of the large number of Consumer Protection Cases filed in this court.

Initially, the court finds nothing improper with LW&G's practice of educating the trustees to look for potential consumer protection claims by developing and distributing a questionnaire designed to evaluate such claims. This is no different than trustees learning the right questions to ask to discover any undisclosed or previously overlooked asset. The questions should be asked because it is an opportunity—not a guarantee—to enhance the bankruptcy estate.

Next, is LW&G's practice of sending a paralegal to the first meeting of creditors improper? This procedure initially causes some pause because it suggests that the paralegal may be practicing law without a license or engaging in the improper solicitation of legal business. But neither concern is warranted here.

In truth, the paralegal is not even necessary. The trustees ask the questions and decide which cases to refer to LW&G for further evaluation. Perhaps, the better practice may be for LW&G to send a lawyer to hear the debtor and make a credibility evaluation, but it is not uncommon for paralegals, or private investigators, to evaluate potential witnesses or to take initial witness statements in civil or criminal proceedings. Ultimately, the attorney is responsible for supervising these non-lawyers and making the final case evaluation. Nothing here suggests that LW&G's paralegal is practicing law without a license. The meeting of creditors is not a court proceeding. It is a public meeting and non-attorney creditors, even unrepresented corporate creditors, are invited to ask questions. But LW&G's paralegal does not ask questions. She simply takes notes and reports the chapter 7 trustee's referrals back to the law firm.

Is the paralegal improperly soliciting business? Certainly not. LW&G has a continuing

and prior relationship with the chapter 7 trustees.[125]  Marissa Samperisi-Gomez, a contract paralegal with LW&G, was assigned to assist Ms. Herendeen during the Designated Period.  She distributed the questionnaires for the trustee.  She collected up the completed questionnaires, watched the proceedings, and took notes.  Ms. Herendeen, who is an attorney, then questioned the debtors and decided which cases to refer to LW&G.

LW&G works for the trustee and the trustee only.[126]  A consumer protection claim based on pre-bankruptcy conduct is an asset the bankruptcy estate.  And the appointed chapter 7 trustee is statutorily charged with investigating and, if appropriate, monetizing all non-exempt assets. She has the authority to hire a law firm to investigate any claim.  But, for the firm to be paid, the bankruptcy court must approve the firm's retention and the amount of its compensation.  In Consumer Protection Cases, the debtor is never the client of LW&G.

The concern here really is not improper solicitation of legal business, there is none. Rather, it is the perception that the paralegal is drumming up business for the law firm by her mere presence.  Ms. Samperisi-Gomez simply hands out questionnaires and takes notes.[127]  But is business being drummed up by this process?  Absolutely.  Previously overlooked consumer protection claims are being investigated and pursued.   And along with the good claims uncovered, there are no doubt some bad claims too.

Does LW&G sufficiently investigate claims before filing them?  The firm concedes that mistakes were made in preparing the complaint against CadleRock but notes it promptly

---

[125] A "prior professional relationship" is an express exception to the anti-solicitation rules governing the Florida Bar.  *See generally* Rules Regulating the Florida Bar, Rule 4-7.18(a)(1) (Dec. 2018).

[126] 11 U.S.C. § 327(a) provides that "[e]xcept as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys . . . *to represent or assist the trustee* in carrying out the trustee's duties under this title." (emphasis added); *see Smith v. Geltzer*, 507 F.3d 64, 71 (2d Cir. 2007) ("Courts give the [chapter 7] trustee [] deference in choosing special counsel because of the 'highly confidential' relationship between the special counsel-attorney and the trustee-client.  Importantly, the special counsel represents the trustee, not the debtor." (citations omitted)).

[127] Doc. 220, Ex. G (Samperisi-Gomez Dep. 26:13–24).

dismissed the claim.  As for all the other cases filed in this court, LW&G relies on the debtor's testimony taken under oath at the meeting of creditors.[128]  That testimony can be in the form of a recording, a transcript, or a report from the trustee.  Judge May has already found that, for this case, reliance on the sworn testimony of the debtor is not negligence, malpractice, or bad faith.[129] There is no reason that his finding should not extend to the other cases where LW&G relied on the debtor's sworn testimony.

Could LW&G do more?  Of course, they can and frankly they should.  The firm could send an attorney to the meeting of creditors or interview the debtor before filing suit.  They could ask for phone records and could investigate whether the calls were made by the original creditor, the purchaser of the debt, or a third-party debt collector.

But pre-suit investigation of these types of cases is not easy.  Mr. Gonzalez testified that he probably would not have answered the phone if LW&G had called him because he would not have recognized the number.[130]  And Mr. Lash testified that debtors' phone records are difficult and expensive to obtain because they are likely subject to privacy objections by the carriers. Also, they may not yield much useful information without knowing the phone numbers used by the debt collectors.[131]  From the court's observation, the key evidence in most of these cases seems to be the debt collector's phone records and call logs.  Sometimes those records are produced voluntarily.  Sometimes a protective order is required to secure the documents. Sometimes a motion to compel is required.

Here, one questionable assumption got LW&G in trouble.  LW&G assumes that all debt

---

[128] In drafting complaints, information is sometimes drawn from the questionnaire before attorney review.  Doc. 228-1 (Friedman Dep. 46:3–25).  An attorney then reviews the transcript of the meeting of creditors before the complaint is finalized and filed.  Doc. 220, Ex. F (Lash Dep. 110:1–16).
[129] Doc. 232 ¶ 16.
[130] Doc. 220, Ex. D (Gonzales Dep. 47).
[131] Doc. 220, Ex. F (Lash Dep. 107:15–25, 108:1–25).

collectors use automatic calling devices.  They base this assumption on two factors (i) their experience that automatic calling is an "industry standard" and (ii) the fact that the technology is very inexpensive.[132]   LW&G's assumption apparently was incorrect with respect to CadleRock, and the case was promptly dismissed.  LW&G could be more cautious when making this assumption in its initial pleading.  Still, in this case, Mr. Gonzalez testified, albeit after the fact, that a "machine" called him from CadleRock.[133]

But, although LW&G could do more, and as discussed below the court will require more in the future, reliance on the sworn testimony of the debtor does not rise to the level of a bad faith abuse of process warranting sanctions.

Perhaps a comparison to the lawyers recently sanctioned in *In re Engle Cases*[134] is appropriate to put things in perspective.  There, the lawyers filed thousands of tobacco cases that were removed to federal court.  A special master's report found that the attorneys were never authorized to bring most of the cases, many of the plaintiffs did even not smoke, and 588 "personal injury" cases were filed on behalf of dead people.[135]   The *Engle Cases* lawyers also used a questionnaire, but they sent their questionnaire out a year and a half after filing suit![136] Multiple judges on the district court joined in sanctioning the lawyers who, without doubt, wreaked havoc in the Jacksonville Division of the Middle District of Florida and unnecessarily clogged the court's dockets for years.

LW&G's conduct in filing Consumer Protection Cases does not rise to this level.  In reviewing LW&G's voluntary dismissals and dismissals by agreement, the court is reminded of

---

[132] *Id*. at 63:21–25; 64:1–24.
[133] Doc. 220, Ex. D (Gonzales Dep. 40).
[134] *In re Engle Cases*, 283 F. Supp. 3d 1174.
[135] A personal injury case obviously cannot be brought on behalf of a dead person.  *See id*. at 1214–23.
[136] *Id*. at 1194–95.

the Eleventh Circuit's admonition that hindsight is not the appropriate standard to assess the viability of a claim.[137]  It is incumbent upon the court to consider what the attorney knew when he filed the case.  Fortunately, there is no dispute about what LW&G knows when Consumer Protection Cases are filed on behalf of chapter 7 trustees.  LW&G knows what the debtor testified to under oath at the meeting of creditors and the fact of the chapter 7 trustee's referral.  The court cannot conclude that relying on the sworn testimony of the aggrieved party (i.e. the chapter 7 debtor) and the trustee's referral after questioning the debtor is sanctionable bad faith, even in the face of the statistics.

So, what protects debt collectors who do nothing improper and still get sued?  Obviously, in federal district court, the answer is Rule 11, and in bankruptcy court, it is Rule 9011.  Like all contingency fee lawyers, LW&G has no interest in pursuing bad cases.  They get nothing.  But not all debtors tell the truth or have a clear recollection of stressful contacts with creditors.  Debtors, and sometimes lawyers, make mistakes.  That is why Rule 9011 exists, in the hope that it will curtail complex ancillary sanctions litigation.

Here, Rule 9011 kicked in and worked as its drafters anticipated.  CadleRock presented its concerns and LW&G promptly dismissed the adversary proceeding.  CadleRock did not even have to answer the complaint.

Still, CadleRock wants LW&G out of the Consumer Protection Case business.

CadleRock first complains that LW&G did not send them a pre-litigation demand letter.  This may be a good practice, but it is not a statutory prerequisite.  It is hardly sanctionable conduct.  In any event, CadleRock's own spreadsheet of statistics rebuts this argument and reflects that many matters are resolved "presuit" or with "No adversary."[138]

---

[137] *See Merricks v. Adkisson*, 785 F.3d 553, 562 (11th Cir. 2015).
[138] *See* Docs. 352-1 and 352-2.

Next, CadleRock argues that LW&G's practices and procedures are an affront to the bankruptcy system. Underlying this position is an assumption that the courts are unable or unwilling to properly oversee Consumer Protection Cases. At oral argument, counsel for CadleRock conceded that every Consumer Protection Case settlement and every fee awarded to LW&G, and to a chapter 7 trustee, is approved by the bankruptcy court after notice and hearing. But CadleRock complains that creditors will not object to these settlements or fees because their claims against consumer debtors are too small to warrant participation in the chapter 7 case.

CadleRock misses the point. Even if creditors do not object, the court reviews all settlements and fees for reasonableness. Small settlements may be approved because statutory recoveries under the applicable consumer protection laws are small. LW&G's fees have been approved, in part, because the firm consistently takes a voluntary reduction of fees in settled matters and, in part, because the firm is efficient in handling Consumer Protection Cases.

The bottom line is that the decision to enforce consumer protection laws by private attorney generals is the policy decision of Congress and the Florida Legislature. These claims were not created by LW&G, the other law firms engaged in this practice, or the chapter 7 trustees. Admittedly, for the court, Consumer Protection Cases require attention and administration. Nevertheless, it is incumbent upon any federal court to administer and adjudicate all claims properly before it.

This court has handled a great many Consumer Protection Cases filed by LW&G and by other law firms. The cases are handled efficiently and professionally. The lawyers on both sides of the courtroom are prepared, have engaged in a Federal Rule of Bankruptcy Procedure 7026 discovery conference in advance of pretrial hearings, and do not delay the proceedings.

LW&G's practice is no doubt a volume litigation practice based on forms and repeated filings.[139] The firm's work is not always perfect, but for a volume litigation practice the work product is above average and, with direction from the court, continues to improve. The Consumer Protection Cases and the process employed by LW&G are not an affront to the bankruptcy system or an abuse of process.

Accordingly, summary judgment will, again, be entered in favor of LW&G.

Nevertheless, the court's in-depth review of Consumer Protection Cases and experience has led to the conclusion that greater due diligence can only enhance the prosecution and administration of Consumer Protection Cases. Although the court does not find that LW&G's reliance on the sworn testimony of the debtor at the meeting of creditors rises to the level of bad faith warranting sanctions, going forward, the court does find it appropriate to require that LW&G, and any other law firm taking on Consumer Protection Cases, conduct additional due diligence before an application to employ is filed.

Therefore, starting April 15, 2019, this court[140] will require prospective special counsel for Consumer Protection Cases to declare that he or she has listened to or read the debtor's testimony at the meeting of creditors and has (i) spoken directly with the debtor or (ii) the trustee has sent a request to the debt collector for call records that went unanswered for 14 days or (iii) has engaged in some other form of pre-suit investigation. This declaration should be included in the affidavit of disinterestedness filed with the attorney's application for employment, and failure to include the declaration will result in denial of the application.

An order consistent with this Opinion will be entered separately.

---

[139] A complete and thorough description of the software, forms, and procedures used by LW&G and its contractors is found in the deposition of David Freedman (Doc. 228-1).

[140] By this court, I mean only me. I do not purport to speak on behalf of my colleagues on the bench. A notice of this procedure will be posted on the court's website.